**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| MAREN K. BOWLING, Derivatively on Behalf of Nominal Defendant UiPATH, INC., <br><br> Plaintiff, <br><br> v. <br><br> DANIEL DINES, ASHIM GUPTA, PHILIPPE BOTTERI, CARL ESCHENBACH, MICHAEL GORDON, KIMBERLY L. HAMMONDS, DANIEL D. SPRINGER, LAELA STURDY, JENNIFER TEJADA, RICHARD P. WONG, and THOMAS MENDOZA, <br><br> Defendants, <br><br> and <br><br> UiPATH, INC., <br><br> Nominal Defendant. | Case No.: <br><br><br> **VERIFIED SHAREHOLDER** <br> **DERIVATIVE COMPLAINT** <br><br><br> JURY TRIAL DEMANDED |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff, Maren K. Bowling ("Plaintiff"), represented by the undersigned attorneys, initiates this derivative complaint on behalf of nominal defendant UiPath, Inc. ("UiPath" or the "Company"). The lawsuit is brought against current and former members of UiPath's Board of Directors (the "Board") and specific executive officers, Daniel Dines, Ashim Gupta, Philippe Botteri, Carl Eschenbach, Michael Gordon, Kimberly L. Hammonds, Thomas Mendoza, Daniel Springer, Laela Sturdy, Jennifer Tejada, and Richard P. Wong (the "Individual Defendants") with the aim of addressing the breaches of fiduciary duties and violations of federal law committed by the Individual Defendants. Plaintiff asserts the following allegations based on personal knowledge pertaining to themselves and their actions, and on information and belief regarding all other

matters. This belief is founded, among other sources, on an investigation conducted by Plaintiff's attorneys, encompassing a review of publicly available documents of the Defendants, conference call transcripts, announcements by Defendants, United States Securities and Exchange Commission ("SEC") filings, press releases concerning UiPath, legal filings, news reports, securities analysts' reports about the Company, and other publicly accessible information. Additionally, reference is made to a class action complaint, titled *Gera v. UiPath Inc. et al*, 1:23-cv-07908 (S.D.N.Y.) (the "Securities Complaint"), which alleges violations of federal securities laws by the Company, certain directors, and officers in the Securities Class Action.

## **NATURE OF THE ACTION**

1.    This is a shareholder derivative action brought for the benefit of UiPath to redress breaches of fiduciary duty by certain officers and members of the Company's Board between at least April 21, 2021 and March 30, 2022 (the "Relevant Period") as set forth below.

2.    UiPath is Delaware corporation that describes itself as providing an "AI-powered . . . Business Automation Platform [that] combines the leading robotic process automation (RPA) solution with a full suite of capabilities to understand, automate, and operate end-to-end processes, offering unprecedented time-to-value." The Company's software is supposed to allow its clients to employ "bots" to automate repetitive or routine tasks such as extracting information from documents, data entry, and data management through automation. This empowers company employees to focus on more intricate or strategic tasks, enhancing overall productivity and efficiency.

3.    UiPath categorizes its revenue into three segments: (i) licenses; (ii) maintenance and support, known as "subscription services revenue"; and (iii) services and other, referred to as "professional services and other revenue".

4.   The Company's licensing revenue is derived from the sale of the company's software licenses, typically offered on annual or multi-year terms. Whereas, the Company's maintenance and support revenues are comprised of fees generated from technical support services provided to customers. Lastly, services and other revenue includes fees generated by the Company from building automation for customers, educating customers, and providing training to customers.

5.   UiPath recognizes revenue from license sales when customers can use and benefit from the company's software, typically upon software delivery or when customers renew existing software licenses. In contrast, maintenance and support revenues are recognized over the term of the arrangement, while services and other revenues are recognized upon the completion of the performed services.

6.   On April 21, 2021, UiPath successfully concluded its initial public offering ("IPO"), releasing more than 27.5 million shares at a price of $56 per share, resulting in gross proceeds exceeding $1.5 billion. In the period leading up to the IPO and the subsequent months, the Individual Defendants exaggerated UiPath's total addressable market ("TAM") and presented misleading information about the demand for the company's software products. Contrary to these assertions, the company was experiencing a decline in market share to well-established enterprise software providers such as Microsoft, IBM, and Salesforce, who seamlessly integrated automation software into their existing platforms. Additionally, UiPath faced competition from cost-effective, low-code automation solutions, exemplified by Microsoft's Power Automate.

7.   Notably, the Board strategically structured the IPO to exempt board members and company insiders from a conventional lock-up period. This arrangement permitted insiders to promptly sell their shares.

8.   Rather than disclose these adverse demand and competition trends, the Individual

Defendants enacted a scheme to conceal the diminishing demand for UiPath's software. First, UiPath implemented widespread discounts to temporarily enhance sales. As this strategy was unsustainable, the Company then began introducing "ramping" contracts involving relatively modest initial RPA commitments which could ostensibly grow over time. Due to the unique way in which the Company reported annualized revenue and growth figures, these ramping contracts created illusory demand growth.

9.   Consequently, both preceding and succeeding the IPO, the Defendants engaged in a concerted effort to artificially inflate the Company's stock price, facilitating Company insiders in maximizing their financial gains. This stratagem proved notably successful. Subsequent to the IPO, Company insiders liquidated 18,853,999 shares of Company common stock, yielding returns totaling $1.055 billion. The trend persisted post-IPO, with Defendants Dines, Gupta, Botteri, and Wong collectively selling 511,641 shares of Company common stock for returns amounting to $26,754,082 between November 2021 and March 2022.

10.  The revelation of the fraudulent scheme unfolded gradually through a sequence of corrective financial disclosures commencing in September 2021. Following UiPath's disclosure of underwhelming financial results in September 2021 and March 2022, the Company's stock witnessed a significant decline, reaching a nadir of $22 per share. This marked a stark contrast to the Relevant Period's peak price of $90 per share, representing a decline of over 75%.

11.  Throughout the Relevant Period, Defendants made materially false and/or misleading statements and omitted material adverse facts about the Company's business. They failed to disclose that: (i) a pre-IPO discounting program temporarily boosted revenue and its annualized revenue run rate (or "ARR") metrics but risked future sales, eroded margins, and increased client churn; (ii) the actual total addressable market was smaller than portrayed, as many surveyed

companies didn't require UiPath's high-cost, high-functionality automation products; (iii) the Company lost customers to competitors like Microsoft, ServiceNow, SAP, Salesforce, IBM, and others integrating automation into existing platforms; (iv) customer losses were exacerbated by the availability of lower-cost, low-code automation software from vendors like Microsoft's Power Automate; (v) strained relationships with partners led to a loss of channel sales; (vi) the Company lacked internal controls; and as a result, (vii) Defendants' statements about the Company's business were materially false and misleading or lacked a reasonable basis.

12. Moreover, throughout the Relevant Period, Defendants made false statements, failing to disclose that: (i) the "ramping" model and emphasis on the ARR metric created a misleading impression of client demand and revenue and ARR growth, as lower initial commitments induced customers who wouldn't make larger commitments later; and (ii) the use of this model was partly due to UiPath's inability to sign customers for longer-term engagements without substantial discounting.

13. The Individual Defendants breached their fiduciary duties by not correcting these false statements and omissions and engaging in these acts. In fact, during the Relevant Period, five Individual Defendants sold Company shares at artificially inflated prices, reaping over $500 million.

14. The Individual Defendants' misconduct has directly and proximately caused substantial financial harm to the Company. This includes the expenses related to defending against potential class-wide liability in the Securities Class Action, along with additional damages such as reputational harm and the loss of goodwill.

15. In view of the nature and severity of the breaches of fiduciary duty alleged herein by the Individual Defendants, most of whom are current UiPath directors, and their inability to  be

disinterested or independent with respect to the subject matter of this derivative action or the underlying *Gera* shareholder securities class action, as each member of the Board faces a substantial likelihood of liability for the misconduct alleged, Plaintiff did not make a demand on the Board because, any such demand would be futile and should be excused.

## JURISDICTION AND VENUE

16. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §§ 78j(b) and 78t(a)).

17. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

18. In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

19. This derivative action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

20. Venue is appropriately established in this judicial District under 28 U.S.C. §1391(b)(1) and §27(a) of the Exchange Act (15 U.S.C. §78aa(a)). Throughout the relevant periods, UiPath engaged in significant business operations within this District. Moreover, a substantial portion of the alleged acts, encompassing the creation and dissemination of materially false and misleading information, transpired within this District.

## PARTIES

### Plaintiff

21. Plaintiff is, and has been continuously throughout all times during the Relevant Period, the owner of UiPath common stock.

**Nominal Defendant UiPath**

22. Nominal defendant UiPath is a Delaware corporation with its principal place of business located at 90 Park Avenue, 20th Floor New York, New York. The Company's stock trades on the New York Stock Exchange ("NYSE") under the ticker "PATH."

**Individual Defendants**

23. Defendant Daniel Dines ("Dines"), the co-founder of UiPath, has served as Chairman of the Board and CEO throughout the relevant period. As per public filings, Dines received $669,646 in compensation for the fiscal year ending January 31, 2022. As of April 18, 2023, Dines beneficially owned 27,011,840 shares of Class A common stock and 82,452,748 shares (100% of UiPath Class B common stock), with a combined value exceeding $1.7 billion. This share ownership affords him 86.6% of the total voting power in the Company.

24. Throughout the Relevant Period, Defendant Dines sold over $77 million worth of Company shares during the IPO and an additional $2.6 million shortly thereafter, capitalizing on artificially inflated prices.

25. Defendant Philippe Botteri ("Botteri") has been a director of UiPath since February, 2020 and serves as a member of the Nominating and Corporate Governance Committee. According to the Company's public filings, Defendant Botteri received $948,046 in compensation from the Company during the fiscal year ended January 31, 2022. As of April 18, 2023, Defendant Botteri beneficially owned 60,974,155 shares, or 12.8% of UiPath's outstanding Class A shares valued at $972.5 million.

26. Throughout the Relevant Period, Defendant Botteri sold over $314,136,508 worth of Company shares, capitalizing on artificially inflated prices.

27. Defendant Carl Eschenbach ("Eschenbach") has been a continuous member of the Board and, during the Relevant Period, served on the Audit Committee until his resignation on March 7, 2023. As per the Company's public filings, Eschenbach received $948,046 in compensation for the fiscal year ending January 31, 2022.

28. Defendant Michael Gordon ("Gordon") has been a continuous member of the Board and serves as the Chair of the Audit Committee. As indicated in the Company's public filings, Gordon received $45,000 in compensation for the fiscal year ending January 31, 2022. Moreover, Defendant Gordon owned 131,384 shares of Class A Common Stock with a value of $2.1 million as of April 18, 2023.

29. Defendant Kimberly L. Hammonds ("Hammonds") is, and at all relevant times has been, a member of the Board. As per the Company's public filings, Defendant Hammonds received $1,558,881 in compensation during the fiscal year ending January 31, 2022.

30. Defendant Thomas Mendoza ("Mendoza") served as a member of the Board, during a portion of the Relevant Period, from October 2017 until June 2021.

31. Defendant Daniel D. Springer ("Springer") has consistently been a member of the Board and serves on both the Audit Committee and the Compensation Committee. As indicated in the Company's public filings, Defendant Springer received $4,582,893 in compensation during the fiscal year ending January 31, 2022. Additionally, as of April 18, 2023, Defendant Springer owned UiPath shares valued at approximately $889,021.

32. Defendant Laela Sturdy ("Sturdy") is, and has been a Company director during the Relevant Period and serves on the Nominating and Corporate Governance Committee. Defendant

Sturdy also was a board observer from November 2018 to March 2021. As of April 18, 2023, Defendant Sturdy owned 19,383 shares of Class A Common Stock, valued at approximately $309,159 based on the closing price of $15.95 per share on that date.

33. In the 2023 Fiscal Year, Defendant Sturdy received $233,539 in total compensation from the Company, comprising $52,500 in fees earned in cash and $181,039 in stock awards. In the 2022 Fiscal Year, she received $949,296 in total compensation, including $46,250 in cash fees and $903,046 in stock awards.  Moreover, Defendant Sturdy engaged in lucrative insider sales during the Relevant Period. On April 23, 2021, she sold 1,527,673 shares of Company common stock, yielding proceeds of $85,549,688. These insider sales, conducted with knowledge of material nonpublic information before the exposure of material misstatements and omissions, underscore her involvement in and motivation for participating in the scheme.

34. Defendant Jennifer Tejada ("Tejada") is, Defendant Tejada held the position of Company director from October 2020 until her resignation on April 11, 2023. Before her departure, she served as the Chair of the Nominating and Corporate Governance Committee.

35. In the 2023 Fiscal Year, Defendant Tejada received $226,039 in total compensation from the Company, consisting of $45,000 in cash fees and $181,039 in stock awards. In the 2022 Fiscal Year, her total compensation from the Company amounted to $1,557,631, with $45,000 in cash fees and $1,512,631 in stock awards.

36. Defendant Richard P. Wong ("Wong") is, and has been a Company director since March 2018 and currently serves as the Chair of the Compensation Committee. As of April 18, 2023, Defendant Wong beneficially owned 60,547,299 shares of Class A Common Stock, valued at approximately $965.7 million based on the closing price of $15.95 per share on that date.

37. According to the Company's public filings, Defendant Wong received $963,046 in compensation from the Company during the fiscal year ended January 31, 2022. Moreover, during the Relevant Period and while the stock price was artificially inflated, Defendant Wong sold 5,504,386 shares of UiPath stock, reaping proceeds of $305,791,801.

38. Defendant Ashim Gupta ("Gupta") serves as UiPath's CFO and has held this position throughout the relevant period. As indicated in the Company's public filings, Gupta received $22,709,483 in compensation for the fiscal year ending January 31, 2022.

39. Following the IPO, Gupta engaged in substantial insider selling, liquidating over $13 million worth of Company shares between June 2021 and January 2022, with transactions occurring at prices as high as $70.76 per share.

40. The Defendants identified in ¶¶ 21-38 are collectively referred to herein as the "Individual Defendants."

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

41. The Individual Defendants, in their capacities as officers and/or directors of UiPath, carried fiduciary responsibilities to the Company and its shareholders. These obligations encompassed trust, loyalty, good faith, and due care, demanding that the Individual Defendants manage UiPath fairly, justly, honestly, and equitably while acting in the best interests of the company and its shareholders.

42. By virtue of their control and authority as directors and/or officers, the Individual Defendants directly and/or indirectly influenced the wrongful acts described in this complaint.

43. Every director and officer of UiPath bears the fiduciary duty to exercise good faith and diligence in administering the company, safeguarding its property and assets, and upholding the highest standards of fair dealing.

44. Each Individual Defendant, in his or her roles as directors and/or officers, owed the Company and its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence.

45. The actions complained of here involve a deliberate and culpable violation of these obligations, a lack of good faith, or a reckless disregard for duties to the Company and its shareholders, posing a known or should-have-known risk of significant harm to the Company.

46. As senior executives and/or directors of a publicly-traded company registered with the SEC and traded on the NYSE, the Individual Defendants were obligated to prevent and avoid disseminating inaccurate information about the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects. This included ensuring truthful, accurate, and fairly presented information in regulatory filings with the SEC to establish the market price of the Company's common stock based on reliable information.

47. To fulfill their responsibilities, UiPath's officers and directors were obligated to exercise reasonable and prudent oversight over the management, policies, practices, and internal controls of the Company. In light of these duties, each of the Individual Defendants were required to, among other things: (i) Ensure the diligent, honest, and prudent operation of the Company in compliance with the laws and regulations of Delaware and the United States, as well as UiPath's own Global Code of Conduct. (ii) Conduct the Company's affairs efficiently and in a business-like manner to provide the highest quality performance, prevent the waste of Company assets, and maximize the value of the Company's stock. (iii) Stay informed about UiPath's operations and, upon notice of imprudent or unsound conditions or practices, conduct reasonable inquiries and take corrective measures. (iv) Establish and maintain accurate records and reports of the business

and internal affairs, with procedures for reporting to the Board, and periodically investigate or cause independent investigations of these reports and records. (v) Maintain an effective system of internal legal, financial, and management controls, ensuring compliance with all applicable laws, and accuracy in the Company's financial statements and regulatory filings with the SEC. (vi) Exercise reasonable control and supervision over public statements by the Company's officers and employees, as well as any other reports or information required by law to be disseminated. (vii) Examine and evaluate reports of examinations, audits, or other financial information concerning the Company's financial affairs, and provide full and accurate disclosure of all material facts related to the aforementioned duties.

48. During the Relevant Period, each of the Individual Defendants were the agents of each other and of UiPath and were at all times acting within the course and scope of that agency.

## **CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

49. The Individual Defendants, in engaging in the alleged wrongful acts herein, have pursued a collective course of conduct, acting in concert and conspiring with each other. They compelled the Company to conceal the true facts, aiding and abetting and/or assisting one another in breaching their respective duties.

50. The conspiracy, common enterprise, and/or common course of conduct aimed to, among other things, facilitate and disguise the Individual Defendants' violations of the law, including breaches of fiduciary duty and unjust enrichment.

51. The Individual Defendants executed their conspiracy, common enterprise, and/or common course of conduct by purposefully, recklessly, or negligently causing the Company to conceal material facts, refrain from correcting misrepresentations, and violate applicable laws.

52. In pursuit of this plan, conspiracy, and course of conduct, the Individual Defendants

collectively and individually carried out the actions described herein. As these actions took place under the authority of the Board, each Individual Defendant, being a director or officer of UiPath, played a direct, necessary, and substantial role in the alleged conspiracy, common enterprise, and/or common course of conduct.

53. Each Individual Defendant provided substantial assistance and aided and abetted the wrongs alleged herein. By taking actions that substantially assisted in the commission of the wrongdoing, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, directly participated in or substantially assisted in its accomplishment, and was or should have been aware of their overall contribution to and furtherance of the wrongdoing.

## UIPATH'S CODE OF CONDUCT

54. The Global Code of Conduct ("Code of Conduct") "outlines our values and the policies that govern how we operate with our customers, partners, communities, and each other."  Take the time to read it and understand how it applies to everything you do at UiPath.  . . . . With every decision and action, we have an opportunity—and an obligation—to represent our values and follow our Code of Conduct."

55. Moreover, the Code of Conduct expressly applies to "all employees, freelancers, those employed by carriers or other contingent workers acting on behalf of UiPath ("UiPathers"), as well as the Company's business partners," and violations of the Code of Conduct "may result in discipline, up to and including, termination."

56. In a Code of Conduct subsection titled "Compliance with the Law," the Code of Conduct states: "All UiPathers, as well as its business partners, are expected at all times to strictly obey all applicable laws and regulations."

57. The Code of Conduct section titled "Financial Disclosures" states: "UiPath is required to maintain accurate financial books and records reflecting the true nature of UiPath's operations and finances. Falsification of company business documents is expressly prohibited." Moreover, this section requires any employee who becomes aware of a departure from these standards to report said departure to a supervisor, the Compliance officer, or the Audit Committee.

58. In a Code of Conduct subsection titled "Disclosure of Inside Information," the Code of Conduct states:

> As a UiPather, you may be privy to confidential information of UiPath or its customers or partners that may provide you or anyone to whom you disclose such information an unfair financial advantage as it pertains to the purchasing or selling of equity in such companies. The use of such inside information with respect to purchasing or selling equity is unlawful and may lead to civil and/or criminal liability.

## UIPATH'S AUDIT COMMITTEE CHARTER

59. UiPath's Audit Committee Charter provides, *inter alia*, that the "purpose of the Audit Committee" is to "oversee the Company's accounting and financial reporting processes, systems of internal control, financial statement audits and the integrity of the Company's financial statements" and "help the Board oversee the Company's legal and regulatory compliance, including risk assessment ."

60. Among the responsibilities delegated to the Company's Audit Committee is the review of the Company's financial statements:

> **Audited Financial Statement Review; Quarterly and Annual Reports.** The Committee will review the annual audited financial statements, the quarterly financial statements and the Company's "Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Risk Factors," as appropriate, with management and the Auditors. The Committee will be responsible for recommending to the Board whether the proposed annual audited financial statements should be included in the Company's Annual Report on Form 10-K.

61. With respect to the Company's earnings announcements, the Audit Committee Charter states: "The Committee will review and discuss with management and the Auditors any proposed earnings press releases and other financial information and guidance regarding the Company's results of operations provided publicly or to ratings agencies."

62. With respect to risk management, the Audit Committee Charter states that: "The Committee will review and discuss with management and the Auditors the Company's processes and policies on risk identification, management and assessment in all areas of the Company's business."

63. The Audit Committee Charter further states:

> The Committee will confer with management and the Auditors concerning the scope, design, adequacy and effectiveness of internal control over financial reporting and the Company's disclosure controls and procedures. The Committee will review reports on significant findings and recommendations with respect to internal controls over financial reporting, together with management responses and any special audit steps adopted in light of any material control deficiencies.

## CORPORATE GOVERNANCE GUIDELINES

64. UiPath also maintains Corporate Governance Guidelines. The Corporate Governance Guidelines state in pertinent part, that "A director should discharge his or her duties, including duties as a member of any committee on which he or she serves, in good faith and in a manner the director reasonably believes to be in the best interests of the Company and its stockholders."

65. Moreover, the Corporate Governance Guidelines states that the "Directors may not use such confidential information for personal benefit or to benefit other persons or entities other than the Company.

66. In contravention of both the Code of Conduct and the Corporate Governance

15

Guidelines, the Individual Defendants, holding positions as controlling shareholders, key officers, and members of the Company's Board, demonstrated minimal, if any, oversight regarding the Company's involvement in their scheme. This scheme involved the issuance of materially false and misleading statements to the public, aiming to facilitate and conceal the Individual Defendants' violations of the law. These violations encompass breaches of fiduciary duty, gross mismanagement, abuse of control, corporate asset wastage, unjust enrichment, and infringements of Sections 10(b), 20(a), and Rule 10b-5 under the Exchange Act.

## **SUBSTANTIVE ALLEGATIONS**

### **Background**

67. UiPath, established in 2005, touts itself as a global leader in Robotic Process Automation (RPA) software. RPA enables companies to automate repetitive tasks through software "bots," streamlining processes like data extraction, entry, and management, allowing employees to focus on more strategic responsibilities.

68. The majority of UiPath's revenue is derived from software license sales, constituting 57% of the total revenue in 2021. The company also generates revenue from software maintenance, updates, and technical services. Licensing revenue is recognized upon delivery, while maintenance revenue is recognized over the term of the arrangement.

69. UiPath emphasizes its Annualized Renewal Run-Rate (ARR) as a key performance indicator. ARR represents annualized invoice amounts from subscription licenses and maintenance obligations. However, it doesn't account for reductions due to non-renewals or cancellations. Net New ARR measures quarterly growth relative to the previous quarter.

70. During the pandemic, UiPath claimed resilience despite increased demand for automation. The heightened demand prompted established enterprise software providers like

16

Microsoft, IBM, and Salesforce to enter the automation industry. UiPath, however, downplayed Microsoft's significance as a competitor for "low-code" automation, portraying them instead as a valuable partner throughout the Relevant Period.

71. UiPath's IPO on April 21, 2021, raised over $1.5 billion, with insiders, including Defendant Dines, selling over half of the shares. The IPO was structured to allow insiders to sell their personal holdings soon after the Company went public, instead of forcing insiders to hold for the customary 180-day lock-up period.

72. Specifically, as soon as the shortened lock-up period expired, Defendant Dines sold an additional $2.5 million worth of Company shares in November 2021 at artificially inflated prices, and Defendant Gupta sold $13 million worth UiPath shares between June 2021 and January 2022 at prices as high as $70.76 per share.

73. In advance of the IPO, the Individual Defendants misleadingly touted UiPath's "rapid growth" and claimed that the Company, which had yet to attain profitability, had "accelerated its path to profitability."

74. For example, documents issued in connection with the IPO reported ARR of more than $580 million in the fiscal year ended January 31, 2021, representing year-over-year growth of 65%, and revenues of more than $600 million during the same period, representing year-over-year growth of 81%.

75. Following the IPO, the Individual Defendants continued to issue false and misleading statements regarding the Company's growth prospects and in particular, its total addressable market ("TAM"). For instance, during a June 8, 2021 investor call, Defendant Gupta stated that "as our results underscore, we are consistently winning these competitive evaluations" with other automation companies and that "we continue to feel in the discussions here the TAM $60 billion

dollars is real, every single industry, every single department, every single process, every single employee . . . . So you can see also customers migrating away from our competitors and to us."

76. The Individual Defendants also misleadingly downplayed competitive threats facing the Company, in particular by Microsoft.

77. For example, during the same investor call on June 8, 2021, Defendant Dines claimed that UiPath's offerings were "very differentiated" from those of Microsoft and stated that comparing the two was "like comparing apples to oranges."

78. The Individual Defendants' statements overstated UiPath's total addressable market because the Company's expensive products had limited use cases for business that did not need full RPA software. UiPath was also losing market share to lower-cost automation solutions like Power Automate. The Company further lost market share to established enterprise software companies like Microsoft, IBM, and Salesforce who were able to bundle their low-code automation products into their existing enterprise software suites, reducing the need for additional software.

79. The Individual Defendants engaged in a deceptive scheme to conceal these adverse demand trends until after they had dumped tens of millions of dollars' worth of Company stock at artificially inflated prices. First, leading up to the IPO, UiPath utilized widespread discounts to temporarily inflate client demand. These discounts had the effect of cannibalizing future sales, reducing margins, and increasing customer turnover. Second, because this strategy was unstainable, soon after the IPO the Company began offering "ramping" contracts involving relatively modest initial RPA commitments which could ostensibly grow over time. This created illusory ARR growth, as the relatively profitable later portions of the contracts' terms were averaged over the initial term pursuant to the Company's method of calculating ARR. However,

the Individual Defendants were aware that the Company risked ultimately not obtaining the annualized revenue that was reflected in its ARR figures in the event customers canceled or chose not to renew their contracts.

80. As a result of the Individual Defendants false and misleading statements, the price of Company stock initially soared above its IPO price, reaching a Relevant Period high of $90 per share in May 2021.

81. The truth with respect to the Individual Defendants' fraudulent scheme eventually emerged, but not before the Individual Defendants sold tens of millions of dollars' worth of personal holdings of Company stock.

82. On September 7, 2021, UiPath announced its quarterly results for the second quarter of 2022, which revealed a dramatic slowdown in the Company's revenue and ARR growth rates. On the corresponding investor call, Defendant Gupta revealed that the Company's financial results provided in connection with the IPO had been inflated due to previously undisclosed discounting and explained that UiPath was shifting away from discounted contracts and toward a "ramping" contract model. In the following fiscal quarter, the Company reported meager net new ARR growth of just 42%. On the corresponding investor call, Defendant Gupta reiterated that the Company would be continuing to "reduce [its] dependency" on discounted multiyear contracts now that UiPath had "cash in the bank."

83.  On March 30, 2022, the Company reported disappointing revenue and ARR guidance for fiscal year 2023, indicating that the Company's downward growth trajectory was expected to continue.

84. As a result of these disclosures, the price of UiPath stock fell to a low of less than $22 per share, a decline of more than 75% from the Relevant Period high.

**False and Misleading Statements Made During the Relevant Period**

85. The Relevant Period begins on April 21, 2021, when UiPath filed a Prospectus on Form 424B4 with the SEC (the "Prospectus"), which highlighted the Company's "rapid" growth rate:

> *We have experienced rapid growth*. Our ARR was $351.4 million and $580.4 million in the fiscal years ended January 31, 2020 and 2021, respectively, *representing a growth rate of 65%*. We generated revenue of $336.2 million and $607.6 million, representing a growth rate of 81%, and a net loss of $519.9 million and $92.4 million in the fiscal years ended January 31, 2020 and 2021, respectively.

(Emphasis added).

86. The Prospectus linked UiPath's "hyper-growth and market capture" to key investments and the operational leverage in its business model in 2020 and 2021:

> In fiscal year 2020, we continued to make investments that *enabled our hyper-growth and market capture,* and began to focus on realizing the operational leverage inherent in our business model and customer economics. In fiscal year 2021, we continued our focus on demonstrating the operational leverage in our business model, *while prioritizing investments that will allow us to continue to achieve best-in-class growth and business scale and to capitalize on our significant market opportunity.*
>
> We have made incredible progress in building a world-class business. Today, we are a company committed to solving for both growth and efficiency and have accelerated our path to profitability while continuing to deliver hyper-growth.

(Emphasis added).

87. The Prospectus further lauded the Company's revenue growth as follows:

> *Total revenue increased by $271.5 million, or 81%, for the fiscal year ended January 31, 2021 compared to the fiscal year ended January 31, 2020, primarily due to an increase in our licenses revenue of $144.4 million,* an increase in our maintenance and support revenue of $112.9 million and an increase in services and other revenues of $14.2 million. Approximately 75% of the increase in revenue was attributable to growth from existing customers, and the remaining increase in revenue was attributable to new customers. As we continued to expand our sales efforts in the United States and internationally, our increase in total revenue was consistent across all regions.

(Emphasis added).

88. On June 8, 2021, UiPath issued a release (the "1Q22 Release") announcing financial results for the first quarter of 2022. The release disclosed an impressive ARR of $652.6 million for the quarter, showcasing a notable 64% increase year-over-year. Additionally, the 1Q22 Release highlighted revenues of $186.2 million during the same quarter, demonstrating a substantial 65% increase year-over-year. Within the release, Defendant Dines attributed the Company's remarkable ARR growth to the quality of UiPath's products and its "leadership position in enterprise software automation." Defendant Gupta was also quoted in the 1Q22 Release, stating, "We have experienced rapid growth and now have over 8,500 customers worldwide, including 1,105 customers with ARR of $100,000 or greater and 104 customers with ARR of $1 million or greater."

89. Again, On June 8, 2021, in the course of an investor call, Defendant Dines asserted, "Our leadership position in the RPA market is again demonstrated by our ARR growth. . . . We continue to grow multiples of the market and take market share." Echoing this sentiment, Defendant Gupta attributed the Company's "meaningful growth at scale" to its competitive advantage, stating, "And as our results underscore, we are consistently winning these competitive evaluations." Continuing on the same call, Defendant Gupta emphasized, "[T]he opportunity in front of us is enormous and growing. Our strong first quarter results and guidance reflect the growing momentum in our business and the power of our automation flywheel."

90. Defendant Gupta responded to a question regarding financial expectations for the remainder of the year, by stating:

> I just want to start by emphasizing the strength of our quarter. $653 million of ARR and a record quarter of incremental ARR breaking $70 million at $72 million total incremental ARR. When you look at that growth, it was really founded on the fact that *we're continuing to add customers at a really fast pace.* So our customer count is now greater than 8,500 customers. That's up more than 600 sequentially and 2,400 year-over-year. Quite frankly, *this has exceeded our expectations*, and we're looking forward as *our pipeline continues to be strong.*

(Emphasis added).

91. Defendant Dines also chose to downplay the "competitive threat" posed by Microsoft, when he responded to an analysts question by stating:

I would start by saying that we are very differentiated, first of all, in our philosophy towards automation. We have a unique platform that aims to emulate people and their work. Microsoft has built a low-code/no-code platform whose main goal is to provide new applications and analytics to the people. They are like comparing apples to oranges.

Our approach is extremely difficult to replicate. It requires a huge experience curve that we have built over the last 15 years. Our platform is a combination of UI, API and computer vision AI, that is, again, extremely difficult to replicate and it is our secret sauce.

Moreover, I would say that our differentiations come from the 3 major directions. First of all, *we have this unique end-to-end horizontal platform that is really necessary to win in this space*. And this is a space that is about the highest return on investment and the fastest time to value that I've seen almost ever in the world of enterprise software. We are in a business where we can improve the return of investment. And that was very beneficial throughout our history.

We consistently have proven, and *we have beaten our competitors with our technology*. If you go there and if you can show that you are able to implement in half time, imagine the exponential return on investment that happens when you deploy at scale. And by the way, *we're a technology that is proven to deploy at scale, while I would say that Microsoft's approach has not tested large-scale deployments*.

(Emphasis added).

92. Defendant Gupta instead doubled-down by stating that the UiPath's pipeline was "enriched" by gaining market share from its competitors, stating:

[W]e continue to feel in the discussions here the TAM $60 billion dollars is real, every single industry, every single department, every single process, every single employee. *We see that enrich in really the pipeline of what we look at. So you can see also customers migrating away from our competitors and to us*. And that is not just necessarily just about the strength of our individual components, but that is *the strength of our entire platform*.

(Emphasis added.)

93. June 9, 2021, UiPath filed a quarterly report on Form 10-Q for the fiscal period ended April 30, 2021 with the SEC. That filing contained the same financial information that was contained in the 1Q22 Release.

94. The statements identified in ¶¶ 85-93 were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (i) UiPath had implemented widespread discounts prior to the IPO to temporarily inflate the Company's revenue and ARR figures, which ultimately served to cannibalize future sales, erode the Company's margins, and increase client turnover; (ii) the Company's total addressable market was overstated; (iii) UiPath was losing market share to Microsoft, Salesforce, IBM, and other established enterprise software vendors that were able to incorporate automation software into their existing platforms; (iv) UiPath was further losing market share to relatively inexpensive, low-code automation software like Microsoft's Power Automate software; and as a result (v) the Individual Defendants' positive statements regarding UiPath's business, operations, and prospects lacked a reasonable basis.

95. On September 7, 2021, UiPath published a press release announcing the Company's financial results for the fiscal period ended July 31, 2021 (the "2Q22 Release"), which revealed an unanticipated slowdown in revenue and ARR growth.

96. Specifically, the 2Q22 press release revealed a drastic decline in UiPath's ARR annual growth rate from 55% in the previous quarter to just 33%. The 2Q22 Release further exposed that growth in the Company's license revenues had fallen from 57% year-over-year in the previous quarter to just 20%. On the corresponding investor call, Defendant Gupta further disclosed the Company's discounting program before the IPO and its intention to restructure its arrangements with customers and introduce "ramping" contracts, involving relatively modest initial RPA

commitments that could ostensibly grow over time. Defendant Gupta stated: "Looking at our pipeline, which is strong across geographies, we see the opportunity to move customers to deal structures with annual ramping, which we expect will lower our overall discounts."

97. In response to an analysts questions, Defendant Gupta further detailed the Company's shift away from discounted deals when he stated:

> Billings duration is down, and that is because we've deemphasized prepaid deals given our cash position and our gross retention rate. So when your gross retention rate is 98%, we don't feel kind of compelled to trade any type of discount for long for getting the cash in the door right today. We're able to make better and better economic decisions from the position of strength.

98. Following this announcement, UiPath stock experienced a 12% decline, dropping from $62.46 per share on September 7, 2021, to $54.40 per share on September 9, 2021. Despite this decrease, the stock price remained artificially inflated as a result of continued issuance of materially false and misleading statements by the Individual Defendants, who continued to conceal the complete truth about UiPath's business, operations, and prospects.

99. The 2Q22 Release disclosed an ARR of $726.5 million for the quarter, reflecting a 60% increase year-over-year. Additionally, it unveiled $195.5 million in revenues earned during the same quarter, indicating a 40% increase year-over-year.

100.   Defendant Gupta pegged these results to UiPath's "competitive differentiation," stating:

> The team executed well this quarter as *we continue to drive meaningful growth at scale*. Our land and expand go-to-model delivered record net new ARR, *a testament to our competitive differentiation* and the power of our platform to drive meaningful return on investment for our customers. Looking ahead, our priority is to continue to drive growth while exercising operational rigor, *which will allow us to maintain our clear leadership position in this large and growing market*.

(Emphasis added).

101.    Also on September 7, 2021, during an investor call, Defendant Dines touted the

Company's customer growth as an indicator of strong demand for automation:

> As of the end of the second quarter, our customer base was more than 9,100. ***And the number of our customers who are leveraging our platform to accelerate automation is growing quickly***. We have 1,247 customers that accounted for at least $100,000 in ARR, up 59% from 785 in the second quarter of last year. This includes 118 customers at $1 million-plus in ARR, up 100% from 59. ***These numbers demonstrate not only the significant demand for automation, but demand for automation at scale***.

(Emphasis added).

102.    Defendant Gupta also tied UiPath's "meaningful growth at scale" to the Company's

"market-leading automation platform" during the call.

103.    During that same call, Defendant Dines, in response to an analyst question,

maintained that demand for the Company's products would not wane with the end of pandemic

era restrictions, stating: "As we are getting, hopefully, in the last phase of COVID, we see solid

demand in—for our technology, for our platform. We are seeing quite a solid pipeline for the

second part of the year." Defendant Gupta agreed, stating:

> I look at the long-term demand signals that we see. Daniel talked about the strength of our pipeline. ***We love our competitive position***. The awareness in the market around our platform is higher than ever, as you can see from a lot of the industry reports that have also come out. ***So we actually feel very positive about the long- term demand coming out of COVID***.

(Emphasis added).

104.    Further, Defendant Gupta stated, in response to a question regarding volatility in

UiPath's net new ARR figures, that the Company's pipeline remained "very strong":

> Look, I look at our incremental ARR numbers, the net new ARR that we've been posting, we're very pleased with it. It reflects the investment. It reflects both the strong dollar base – the impact of the strong dollar-based net retention rate as well as the steady execution of new logos. We continue to invest in our sales force.

So as we continue to bring up our sales team and ramp up additional reps, which we've been doing, ***I feel very good about the overall trajectory to fulfill the pipeline that we have in front of us, which has grown and is very strong***.

(Emphasis added).

105.    During that same call, Defendant Dines again downplayed the true competitive threats facing the Company:

So we all know this is a big market growing quickly, and automation is the central piece of the digital transformation. So obviously, all major players in the cloud and the business applications are in our space.

\* \* \*

So Salesforce is seeing a consolidation between low-code/no-code integration and automation. And this is exactly what we have told the market for a long time, and we have expanded into these areas for a long time. With this big release in the fall, you should expect really a smooth integration of our Cloud Elements acquisition that was done in the beginning of this year. So we will make a very well-oiled machine around automation with low-code/no-code that we have introduced a year or something ago. And now we're really combining UI automation and API automation in a very good integrated package.

***We believe that our angle towards this consolidated platform is our angle that comes from emulating people is really the one -- that is the winning angle***. All these small acquisitions made me think that still the big software players don't understand how difficult it is to build emulation software.

***This is our bread and butter***. We have built it for a long time. And starting from this angle, we – ***it gives us a tremendous opportunity to extend our reach to the entire consolidated automation space***.

(Emphasis added).

106.    Defendant Gupta also claimed that the Company's new "ramping" contracts would lead to "long-term engagement" and increase margins for UiPath:

***This structure creates better ROI for our customers, long-term engagement opportunities for our partners and will yield better overall margins for UiPath. It is also positive for ARR growth, which is our most important metric***, but it can create short-term revenue variability due to the timing of license delivery and GAAP revenue recognition.

26

(Emphasis added).

107.    Defendant Gupta, in response to an analyst question, explained how the ramping

model would drive revenue growth:

> So what that means is instead of buying simple annual contracts, what we see a
> larger demand for is getting larger-term commitments from some of our customers.
> **But the way they look at that is instead of buying 10,000 robots today, they may
> buy 1,000 robots today, 5,000 next year, 10,000 in year 3. And those – the license
> deliveries would happen into those years as we go down**.
>
> * * *
>
> And if there's any confusion on ramp, remember what I mean is you can buy robots
> of 100 per year for a 3-year deal or you can buy robots of 100, 200, 300 in a deal.
> **And then the licenses for that additional 100 per year gets delivered in subsequent
> years. [W]hich is why there is – why that creates variability in terms of revenue
> recognition**.

(Emphasis added).

108.    **On** September 8, 2021, the Company submitted a quarterly report on Form 10-Q

for the quarter concluded on July 30, 2021 (the "Q2 22 Form 10-Q"), which bore the signature of

Defendant Gupta. Moreover, appended to the Q2 22 Form 10-Q were SOX certifications endorsed

by Defendants Dines and Gupta, affirming the precision of the financial statements in the Q2 22

Form 10-Q and the efficacy of the Company's internal control over financial reporting. The Q2 22

Form 10-Q included identical financial information as presented by the Company in the 2Q22

Release.

109.    The Company's significantly reduced growth rate in 2Q22 led to a drop in the price

of the Company's common stock, decreasing from $62.46 per share on September 7, 2021, to

$54.50 per share on September 9, 2021. This represented a decline of over $8 per share, translating

to more than 12%, amid higher-than-average trading volume.

110.

111.    On October 14, 2021, Defendants Dines and Gupta presented at the Morgan Stanley

Spark Conference on behalf of UiPath. Defendant Gupta explained how the Company derived its

$60 billion total addressable market:

> *So we actually triangulated it multiple ways and independently verified as well. So we've quantified the market at $60 billion-plus*. And we did it very simply. We took our customer base, segmented our companies by the number of employees because that's relatively correlated to complexity and number of processes that are there. We took the top 10% of our customers and said, if every customer in the market could reach these levels of our top 10%, you do that simple math and you get to this number of $60 billion plus in terms of a total available market.
>
> Qualitatively, when you look at it, I live the TAM because I was a customer. So it was the only piece of software, when I was a CFO or a CIO, that could solve problems for legal, HR, finance, supply chain. So it's really relevant to every single department, every single process and every single employee. *When you look at it both qualitative and quantitatively, you can see the massive market that it really is*.

(Emphasis added).

112.    During this conference, when asked about the competitive threat posed by

Microsoft, Defendant Dines stated:

> So—and I have high respect for Microsoft, especially under Satya. It's a great company. And we don't compete really with Power Platform. Power Platform, it's a big animal. *We compete within – not even with Power Automate, really*. Within this big platform, we compete with a product called Power Automate Desktop, which Microsoft bought 18 months ago from a Greek company. It's a product that was never really proven in large enterprise deployments. It's something that Microsoft sees more like in a personal productivity gain.
>
> So now, if you look at our business, how it is today, we have unattended space, we have attended space. For unattended space, you need a professional tool to – for professional developers. *This is not – Microsoft doesn't even compete in this space. We've never seen them in a competitive situation for unattended robots. So this is half of our business*.
>
> Now when you speak about attended automation, what this citizen developer tool that Microsoft has competes only for like 1 in 10 of the use cases out there. But what is even more important, when you go head-to-head in terms of products, Microsoft's strategy, at least until now, is to build something that works well within Microsoft ecosystem, like in-app type of automation. Microsoft Power Automate

28

Desktop doesn't work well with SAP, with Salesforce, with ServiceNow. So it works within Microsoft Office technologies.

***But these are very few use cases, low-value use cases. In most of the processes that we are automating, we are seeing like 3 more, 3-plus different types, big categories of applications. So at this point, in reality, I think people are more scared about what Microsoft can do in our space than it's really the reality***.

And there is also something that is very specific about this technology, which is not specific in case of Tableau or in case of Slack. This is an enterprise technology that generates huge return on investment. License pricing, if you use the technology that costs you $5 million a year and you generate $100 million in return on investment a year, would you take a technology that cost you $1 million and will generate only $20 million? I don't think.

***So it's a very – and we can make a very simple return on investment, total cost of ownership, time to value. It's kind of easy because look, when you go to a customer and I – and they go to automation, they have to do something meaningful and measurable. So we have the – use Power Automate, use UiPath, automate this process, put whoever you want to automate and if they see – Microsoft sometimes can struggle 3 weeks to do something we can deliver in 2 hours. We've built this for many years. It's not an easy technology to build. So then the return on investment case, it's so clear***.

(Emphasis added).

113.    Defendant Dines further stated, in response to a question about competitive pressure from other enterprise software providers:

***Servicetrace. At least until this point, we really don't compete with ServiceNow or Salesforce. We simply don't compete with them at this point.*** And to me, what they built, it's kind of they sprinkle an RPA term, but buying some kind of cheap companies. And it's mostly used for like in-app automation, which like in the case of Microsoft, this is – this doesn't have too much legs to go over.

***So we – in case of ServiceNow, it's also [an] even more stark[] difference between our go-to-markets. They are primarily an IT shop. We sell primarily to business lines, to CFO, to operations. So I see clearly that it's not conflicting. We are actually customers to each other, we and ServiceNow. So we more partner than compete. We don't compete right now at this point in time***.

(Emphasis added).

114.     The statements delineated in ¶¶ 95-113 were substantially false and deceptive, as and omitted critical materially adverse facts essential to render the statements accurate. This omission included the failure to disclose that: (i) UiPath's adoption of the "ramping" contract model, coupled with the Individual Defendants' emphasis on the Company's ARR metric, created a deceptive appearance of robust demand for UiPath's products due to the low initial commitment enticing customers who would ultimately cancel or choose not to renew contracts in subsequent periods; (ii) the Individual Defendants had exaggerated the Company's total addressable market; (iii) UiPath was ceding market share to providers of low-code automation software offering comparable functionality at a fraction of the cost; (iv) UiPath was relinquishing market share to established enterprise software providers such as Microsoft, ServiceNow, Salesforce, and IBM, who were integrating automation software into their existing platforms; and, consequently, (v) the positive assertions made by the Individual Defendants regarding the Company's business, operations, and prospects lacked a reasonable foundation.

115.     On December 8, 2021, UiPath issued a press release announcing the Company's financial results for the fiscal period ended October 31, 2023 (the "3Q22 Release") which revealed that growth was stagnating. Per the 3Q22 Release UiPath's ARR annual growth rate declined for the third quarter in a row to 58%. The 3Q22 Release further reported 42% year-over-year growth for net new ARR, down from 55% growth rate reported in the 1Q22 Release. During the corresponding conference call, Defendant Gupta reiterated that the Company was shifting away from discounted multiyear contracts:

> And then in terms of the question around duration, billings duration will continue to contract for us, and we've talked about this multiple times in terms of just our focus now with the cash in the bank that we are going to prioritize more 1-year deals and reduce our dependency on multiyear prepaid deals from a cash flow standpoint. That trend continued in the quarter.

30

116.    On the release of this news, the price of UiPath's stock fell from $47.61 per share on December 8, 2021 to $44.05 per share on December 10, 2021, a decline of 7%. Despite this drop, the price of UiPath's stock remained artificially inflated however, as the Individual Defendants continued to obscure the full truth.

117.    The 3Q22 Release unveiled ARR of $818.4 million for the quarter, reflecting a 58% surge year-over-year. Additionally, the 3Q22 Release disclosed $220.8 million in revenues generated during the quarter, signifying a 50% increase year-over-year. Defendant Gupta remarked in the 3Q22 Release: "I am pleased with our third quarter fiscal 2022 results as ARR grew 58 percent and trailing twelve-month revenue grew 57 percent year-over-year, once again demonstrating our market leadership.

118.    Moreover, on a December 8, 2021, investor conference call, Defendant Dines lauded the "considerable demand" for UiPath's automation platform:

> In summary, we had a strong Q3, and we continue to drive growth at scale. ***The market is very healthy, and we see considerable demand for our automation platform***. I feel very good about what we have been able to accomplish across the business since our IPO, and we remain focused on innovation and our customers, which we believe is key to our ongoing success.

(Emphasis added).

119.    Defendant Dines further reiterated on that same call that: "[W]e are very pleased with what we are seeing in front of us. We are seeing a strong Q4. It's—the demand is there. We are seeing really very engaged partners. So overall, we are very pleased with the direction where our business is going."

120.    Defendant Gupta similarly praised UiPath's supposedly "strong pipeline":

> ***The opportunity in front of us is enormous. We have a strong pipeline***, and we feel very good heading into the end of our first fiscal year as a public company. We are building a truly multigenerational company that will change how people experience work. This is what excites us and motivates the team every day. It also

keeps our focus on the long-term value creation for our employees, customers, partners and stockholders.

(Emphasis added).

121.    During that same call, Defendant Dines maintained that UiPath was the "clear leader" among automation software providers, again downplaying the Company's competition:

In the last quarter, ***we have not seen any material moves in terms of the competitive landscape***. And I would start by pointing to the first IDC MarketScape report that put us in a very clear leadership position. ***And I would quote them saying that when it comes to real enterprise automation, real scaled enterprise automation, customers are choosing UiPath***.

And this is, of course, because we offer an end-to-end platform that is suitable from small use cases to the most complex use cases. And indeed, we have this tapestry that we believe it's what helps our customers drive adoption from the process discovery, which is becoming really a driver of growth and helping the adoption, to building automation for both professional developers and citizen developers to strong analytic platforms and to our engagement layer, which is basically our low code, no code app platform, which is really dedicated to automation and integration use cases.

So I would finish my answer saying that automation is really becoming a critical piece of accelerating digital transformation. ***We are the clear leader. And we continue to win deals in very large scores because of our technology and our platform***.

(Emphasis added).

122.    As to the continuing competitive threat UiPath faced from Microsoft specifically, or lack thereof, Defendant Dines stated:

In terms of real enterprise traction, UiPath is really the only tangible choice for enterprises that want to go from small to complex across different divisions that want a really high level of penetration.

***Our own data, if we take into account the deals where Microsoft is participating versus the deals where Microsoft is not participating, we are not seeing material changes in our winning rate. So right now, currently, I can say Microsoft has – doesn't have a meaningful impact on our ability to win customers***.

What is going to happen in the next couple of years? First of all, I would like to make a case that Microsoft is focused with their RPA, mostly on citizen developer

and personnel productivity. This is a small part of our overall TAM. ***So I don't see that in the coming years, Microsoft investment and competing with us will materially derail us from our growth trajectory that we are seeing and we are building right now***.

(Emphasis added).

123.    On December 10, 2021, the Company filed Form its quarterly report for the fiscal period ended October 31, 2021 on form 10Q with the SEC. That filing contained that same financial information that was contained in the 3Q22 Release.

124.    On March 30, 2022, the Company released its financial results for the quarter and year ended January 31, 2022 (the "4Q22 Release"). The 4Q22 Release disclosed revenues of just $289.7 million for the quarter, reflecting a mere 39% year-over-year growth. It also included disheartening ARR and revenue guidance, indicating a continuation of the Company's stagnant growth trends. Specifically, the Company projected first-quarter 2023 ARR in the range of $960 million to $965 million and fiscal 2023 ARR in the range of $1.2 billion to $1.21 billion. Additionally, it provided first-quarter 2023 revenue guidance in the range of $223 million to $225 million and fiscal 2023 revenue guidance in the range of $1.075 billion to $1.085 billion, all of which fell substantially below consensus analysts' expectations.

125.    Additionally, on March 30, 2022, UiPath filed a separate release on Form 8-K announcing the abrupt departure of the Company's Chief Revenue Officer, Thomas Hansen.

126.    On this news, the price of UiPath common stock dropped from $29.04 per share on March 30, 2022, to $21.59 per share on March 31, 2022, representing a decline of 25% in just one day.

127.    By the first fiscal quarter of 2023, the Company's net new ARR had declined by more than 50% sequentially, amounting to just $51.8 million. The Company's revenue growth rate decreased each quarter between the third fiscal quarter of 2022 and the fourth fiscal quarter of

2023, reaching a meager 7% year-over-year growth in the fourth fiscal quarter of 2023. Similarly, UiPath's ARR growth rate declined each quarter from the fourth fiscal quarter of 2022 to the first fiscal quarter of 2024, falling to just 28% year-over-year growth by the first fiscal quarter of 2024. Notably, after UiPath hired Co-CEO Robert Enslin, he acknowledged during a September 7, 2022, investor call that Microsoft's competitive pressure significantly impacted the Company's ability to effectively market its products to clients, stating that Microsoft "certainly does have an impact on how we sell and how we position ourselves in certain companies. And that's also the reason why we have to position the platform and get the branding right for the platform."

128.    The price of UiPath stock would decline to 75% below the Relevant Period high.

**Individual Defendant Insider Sales**

129.    On April 21, 2021, UiPath completed its IPO, raising more than $1.5 billion in gross proceeds. More than half of all shares sold in the IPO were sold by Company insiders, including Defendant Dines, who sold more than $77 million worth of Company shares in the IPO.

130.    Typically, an IPO would be followed by a 180-day lock-up period, whereby insider sales of company stock would be restricted. In the case of the UiPath IPO, however, the Individual Defendants allowed themselves to dump substantial Company shares soon after the offering was completed. Specifically, Defendant Dines sold roughly $2.5 million worth of Company shares in November 2021 at prices above the IPO price, and Defendant Gupta sold over $13 million worth of UiPath shares between June 2021 and January 2022 at prices as high as $70.76 per share.

131.    These insider sales were not part of any regular pattern of sales and were suspicious in terms of timing and amount.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

132.    Plaintiff incorporates by reference and re-alleges each and every allegation stated

above as if set forth fully herein.

133.    Plaintiff has filed this derivative action on behalf of the Company to address and remedy the injuries incurred and anticipated as a direct consequence of the breaches of fiduciary duties committed by the Individual Defendants.

134.    UiPath is included as a nominal party in this action, with no intention of colluding to confer jurisdiction on this Court that it would not otherwise possess.

135.    Plaintiff, a current shareholder of UiPath throughout the period of the alleged wrongdoing by the Individual Defendants, is committed to adequately and fairly representing the Company's interests in pursuing and enforcing its rights. The plaintiff is represented by counsel competent and experienced in derivative litigation.

136.    At the commencement of this action, the seven-member Board comprised the Individual Defendants, including Dines, Botteri, Gordon, Springer, Sturdy, Wong, and Karenann Terrell (who is not an Individual Defendant in this action). The plaintiff is only required to demonstrate that four members of the current Board lack the ability to exercise independent objective judgment regarding the decision to bring or vigorously prosecute this action.

137.    As detailed below, at least six members of the current Board are incapable of making an independent and disinterested decision to institute and vigorously pursue this action due to a substantial likelihood of liability, rendering a demand on the Board futile.

138.    The Individual Defendants, collectively and individually, breached their fiduciary duties of candor, good faith, and loyalty. They knowingly approved and/or permitted the alleged wrongs and participated in efforts to conceal them. The Individual Defendants authorized and/or permitted the issuance of false and misleading statements, disseminated these false statements to the public and shareholders, and are principal beneficiaries of the alleged wrongdoing. They failed

to take any action to recover the illicit proceeds of insider sales and, therefore, cannot fairly and fully prosecute such a suit, even if they initiated it.

139.    The Individual Defendants either knowingly or recklessly issued or caused the Company to issue the alleged materially false and misleading statements. They failed to take any action to recover from the Individual Defendants who wrongfully profited from these statements. The Individual Defendants were aware of the falsity of the misleading statements at the time of issuance and/or, upon learning of their falsity, neglected to claw-back the illicit proceeds of insider sales made by the Individual Defendants who made such statements. Consequently, the Individual Defendants breached their fiduciary duties, face a substantial likelihood of liability, lack disinterest, and demand upon them is futile and thus excused.

140.    As overseers of the Company's affairs, each Individual Defendant possessed knowledge or had the fiduciary obligation to inform themselves of information related to the Company's core operations, material events giving rise to these claims, and the duty to preserve the Company's assets. Specifically, as Board members, the Individual Defendants knew or should have known about the material facts surrounding the Company's overstated total addressable market and its adverse demand and competition trends.

141.    Furthermore, the Individual Defendants willfully ignored or recklessly failed to inform themselves of the evident problems with the Company's internal controls, practices, and procedures. And they failed to make a good faith effort to correct these problems or prevent their recurrence.

142.    Moreover, Defendants Gordon, Eschenbach, Hammonds, and Springer lack disinterest and independence, rendering them incapable of considering a demand without strong bias. Serving or having served as members of the Audit Committee during the relevant period,

these Defendants were specifically entrusted with assisting the Board in overseeing the Company's public disclosures. Nevertheless, they breached their fiduciary duties by failing to prevent, correct, or inform the Board of material misstatements and omissions concerning the active locations count and the associated revenue projections. Consequently, Defendants Gordon, Eschenbach, Hammonds, and Springer cannot objectively evaluate any demand to sue themselves for fiduciary duty breaches, as it would expose them to substantial liability and jeopardize their professional standing.

143.    The Individual Defendants, in their roles as Board members, are bound by the Company's Code of Conduct, which extends beyond basic fiduciary duties, requiring adherence to UiPath's standards of business conduct. The Individual Defendants violated the Code of Conduct by knowingly or recklessly engaging in and participating in the issuance of materially false and misleading statements as alleged herein. Due to their breach of the Code of Conduct, the Individual Defendants face a significant likelihood of liability for fiduciary duty breaches, justifying the conclusion that a demand on them would be futile.

144.    Furthermore, each Individual Defendant received compensation, benefits, stock options, and other perks as a result of their Board membership and control of the Company.

145.    The Individual Defendants, who derive substantial revenue from the Company, maintain control over it, and have mutual financial ties, face conflicts of interest that hinder their ability to adequately monitor the Company's operations and internal controls. These conflicts cast doubt on the conduct of the other Individual Defendants. Importantly, none of the Director Defendants have taken corrective measures to address the alleged conduct. Therefore, seeking a demand on the current Board would be futile.

146.    The Individual Defendants' conduct, detailed herein and summarized above, cannot

be attributed to legitimate business judgment as it was rooted in bad faith and intentional, reckless, or disloyal misconduct. Consequently, none of the directors can claim exculpation from fiduciary duty violations according to the Company's charter. Given that a majority of the directors face a substantial likelihood of liability, they are self-interested in the transactions contested herein. Their ability to exercise independent and disinterested judgment about pursuing this action on behalf of the Company's shareholders cannot be presumed. Thus, demand is excused as being futile.

147.    The actions and conduct challenged in this complaint amount to breaches of fiduciary duties owed by officers and directors of the Company, and these actions cannot be validated through ratification.

148.    The Individual Defendants may potentially be shielded from personal liability for alleged mismanagement and breaches of fiduciary duty through directors' and officers' liability insurance, provided the Company acquired such coverage using corporate funds belonging to UiPath's stockholders. If a directors' and officers' liability insurance policy provides coverage to the Individual Defendants, it might include clauses that exclude coverage for actions directly brought by the Company against the Individual Defendants, including the "insured-versus-insured exclusion." Consequently, if the Director Defendants were to bring a lawsuit against themselves or certain UiPath officers, there would be no protection from directors' and officers' insurance. Conversely, in the case of a derivative suit, such as this one, the existence of such insurance coverage, if applicable, could serve as a means for the Company to pursue recovery. Thus, seeking demand from the Director Defendants is futile and, therefore, excused.

149.    In the absence of directors' and officers' liability insurance, the directors are unlikely to prompt UiPath to sue the Defendants mentioned herein, as doing so would expose them to substantial uninsured personal liability. Therefore, demand would be futile in this scenario as

well.

150.    For all of the aforementioned reasons, all of the directors are unable to consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## COUNT I
**Against the Individual Defendants for
Breach of Fiduciary Duties**

151.    Plaintiff restates and incorporates the preceding allegations as though fully detailed herein.

152.    The Individual Defendants were entrusted with fiduciary responsibilities toward the Company. By virtue of these fiduciary relationships, the Individual Defendants were obligated to uphold the highest standards of good faith, equitable dealings, loyalty, and due diligence in their actions.

153.    The Individual Defendants violated and breached their fiduciary duties, including duties of care, loyalty, reasonable inquiry, and good faith.

154.    The Individual Defendants persistently and systematically failed in fulfilling their fiduciary obligations. Specifically, they breached duties of loyalty and good faith by allowing inadequate practices and procedures to guide the accurate disclosure of Company information to the investing public and shareholders. This included permitting false and misleading statements in the Company's SEC filings and other disclosures and neglecting to establish sufficient internal controls addressing the substantial reporting deficiencies and issues described herein. Such actions could not be deemed a good-faith exercise of prudent business judgment in safeguarding and advancing the Company's corporate interests.

155.    As a consequence of the misconduct alleged herein, the Individual Defendants bear

liability to the Company. The Company has incurred damages, both financial and non-monetary, as a direct and proximate outcome of the Individual Defendants' breach of fiduciary duties. This damage encompasses expenses related to defending itself in the Securities Class Action, exposure to potential class-wide damages in the Securities Class Action, harm to the share price of the Company's stock resulting in increased capital costs, and tarnished corporate image and goodwill.

156.    Plaintiff, as a shareholder of Uipath and on behalf of UiPath, has no adequate remedy at law.

**COUNT II**
**Aiding and Abetting Breaches of Fiduciary Duty**
**Against the Individual Defendants**

157.    Plaintiff hereby restates and incorporates the foregoing allegations by reference as if fully articulated herein.

158.    The Individual Defendants, by encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, have each encouraged, facilitated and advanced their breaches of their fiduciary duties. by so doing, the Individual Defendants have each aided and abetted, conspired and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the illegal conduct complained of herein.

159.    Plaintiff, as a shareholder of UiPath on behalf of UiPath, has no adequate remedy at law.

**COUNT III**

**Against Defendants Dines and Gupta**
**For Breach of Fiduciary Duties**

160.    Plaintiff hereby restates and incorporates the foregoing allegations by reference as if fully articulated herein.

161.    Throughout the Relevant Period, Defendants Dines and Gupta, in their roles within the Company, had access to confidential and proprietary information about UiPath's financial health and future business outlook. Despite their obligation to abstain from trading UiPath's common stock under these circumstances, Defendants Dines and Gupta divested their holdings in the Company at artificially inflated prices before the true state of the Company's finances and future prospects was revealed.

162.    The insider sales described herein deviated from any regular pattern of sales for Defendants Dines and Gupta and raised suspicions in terms of both timing and volume.

163.    The information in question was proprietary and non-public, encompassing details about the Company's financial standing and future business outlook. This information was a proprietary asset owned by the Company, and Defendants Dines and Gupta misused it for personal gain when selling UiPath stock. At the time of their stock sales, Defendants Dines and Gupta were aware of the Company's deteriorating business and prospects, knowledge that, once disclosed, would lead to a significant decline in the inflated price of the Company's common stock.

164.    Defendants Dines' and Gupta's UiPath stock sales, conducted while in possession of this material, adverse, non-public information, constituted a breach of their fiduciary duties of loyalty and good faith.

165.    Plaintiff, as a shareholder of UiPath and on behalf of UiPath, has no adequate remedy at law.

**COUNT IV**
**Against the Individual Defendants for Violations of § 10(b)**
**of the Exchange Act and Rule 10b-5**

166.    Plaintiff hereby restates and incorporates the foregoing allegations by reference as if fully articulated herein.

41

167.    The Individual Defendants violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

168.    The Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the materially false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

169.    The Individual Defendants violated Section 10(b), of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff.

170.    The Individual Defendants acted with scienter because they: (i) knew that the public documents and statements issued or disseminated in the name of UiPath were materially false and misleading; (ii) knew that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.

171.    The Individual Defendants, by virtue of their receipt of information reflecting the true facts of UiPath, their control over, and/or receipt and/or modification of the materially misleading statements alleged herein, and/or their associations with the Company which made them privy to confidential proprietary information concerning UiPath, participated in the fraudulent scheme alleged herein.

172.    As a result of the foregoing, the market price of UiPath common stock was artificially inflated during the relevant time period. In ignorance of the falsity of the statements, Plaintiff relied on the statements described above and/or the integrity of the market price of UiPath common stock in purchasing UiPath common stock at prices that were artificially inflated as a result of these false and misleading statements and were damaged thereby.

173.    In addition, as a result of the wrongful conduct alleged herein, the Company has suffered significant damages, including the costs and expenses incurred in defending itself in the Securities Action and reputational harm. The Individual Defendants, through their violation of Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b-5, have exposed the Company to millions of dollars in potential class-wide damages in the Securities Action.

174.    By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breaches of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

175.    Plaintiff, as a shareholder of UiPath and on behalf of UiPath, has no adequate remedy at law.

### COUNT V
**Against the Individual Defendants for**
**Unjust Enrichment**

176.    Plaintiff hereby restates and incorporates the foregoing allegations by reference as if fully articulated herein.

177.    Through their wrongful acts and omissions, the Individual Defendants were

unjustly enriched at the expense of and to the detriment of UiPath.

178.    The Individual Defendants derived unjust enrichment through bonuses, stock options, or similar compensation from UiPath linked to their performance or the artificially inflated valuation of UiPath.

179.    Defendants Dines and Gupta additionally obtained unjust enrichment concerning insider sales of Company stock.

180.    Plaintiff, acting as a stockholder and representative of the Company, seeks restitution from the Individual Defendants and requests this Court to order the disgorgement of all profits, benefits, and other compensation acquired by the Individual Defendants due to their wrongful conduct and fiduciary breaches.

181.    The Company has incurred substantial damages as a direct and proximate result of the Individual Defendants' misconduct, as detailed herein.

182.    Plaintiff, as a shareholder of UiPath and on behalf of UiPath, lacks an adequate remedy at law.

## **PRAYER FOR RELIEF**

**WHEREFORE**, plaintiff prays for judgment and relief as follows:

(a) Affirming that Plaintiff is entitled to pursue this derivative action on behalf of UiPath and is a suitable and effective representative for the Company;

(b) Granting the Company damages, the exact amount to be determined during trial, stemming from the Individual Defendants' contravention of securities laws, breaches of fiduciary duties, and misappropriation of corporate assets;

(c) Directing UiPath to undertake all necessary measures to rectify and enhance its

corporate governance and internal procedures, ensuring compliance with relevant laws and safeguarding UiPath and its shareholders from a recurrence of the detrimental events described herein. This includes, but is not limited to:

    i. Reinforcing the Board's oversight of operations and compliance with applicable state and federal laws and regulations;

    ii. Enhancing the Company's internal reporting and financial disclosure controls;

    iii. Formulating and implementing procedures for increased shareholder input into the Board's policies and guidelines;

    iv. Strengthening the Board's internal operational control functions;

(d) Awarding restitution to UiPath from the Individual Defendants;

(e) Awarding Plaintiff the expenses and disbursements incurred in the course of the action, encompassing reasonable fees for attorneys, accountants, and experts, as well as other costs and expenses; and

(f) Granting any additional relief that this Court may consider fair and appropriate.

**JURY DEMAND**

Plaintiff respectfully requests a trial by jury on all issues so triable.

Dated: December 6, 2023                **RIGRODSKY LAW, P.A.**

                                        By:  */s/ Herbert W. Mondros*
                                             Seth D. Rigrodsky (#3147)
                                             Gina M. Serra (#5387)
                                             Herbert W. Mondros (#3308)
                                             300 Delaware Avenue, Suite 210
                                             Wilmington, DE 19801
                                             (302) 295-5310
                                             Email: sdr@rl-legal.com
                                                    gms@rl-legal.com
                                                    hwm@rl-legal.com

                                             *Local Counsel for Plaintiff Maren K.*
                                             *Bowling*


                                             Joshua H. Grabar, Esq.
                                             **GRABAR LAW OFFICE**
                                             One Liberty Place
                                             1650 Market Street
                                             Suite 3600
                                             Philadelphia, PA 19103
                                             Telephone:  267-507-6085
                                             Facsimile: 215-507-6048
                                             Email: jgrabar@grabarlaw.com

                                             *Counsel for Plaintiff Maren K. Bowling*